# CHARLESTON.

WIRT W. DONNALLY, ADMR. *v.* JOHN BARTON PAYNE.

Submitted November 1, 1921.    Decided November 22, 1921.

1.  CARRIERS—*Passenger's Doing Act Ordinarily Constituting Contributory Negligence May Not Bar Recovery Where Induced by Carrier.*

    A passenger may take a position or do an act resulting in injury to him, upon invitation or inducement of the carrier, or in consequence of constraining influence imposed upon him by it, however effected or evidenced, which, if done in the absence of such circumstances, would make him guilty of negligence or contributory negligence barring right of recovery, without incurring such negligence or contributory negligence, provided the position so taken or act so done involves no greater risk or hazard than an ordinarily prudent man would assume under the circumstances.    (p. 588).

2.  SAME—*Where Evidence tends to Prove Passenger Assumed Personal Risk at Carrier's Invitation, Negligence or Contributory Negligence is for Jury.*

    If, upon the trial of a case involving such an issue, the evidence tends to prove such invitation, inducement or constraint

and reasonableness of the risk, the passenger is not guilty of negligence or contributory negligence as matter of law, and the issue as to such guilt properly goes to the jury for determination. (p. 591).

3. SAME—*Passenger Held Not Guilty of Contributory Negligence as Matter of Law in the way He Attempted to Leave Train.*

A passenger on a train consisting of several vestibule coaches, carrying workmen as passengers and so crowded as to render progress through the aisles slow and difficult, does not, as matter of law, incur such guilt by reason of his having endeavored to leave the train at his destination, through the arch of the vestibule and the space between the coach and the tender, using the endsill of the tender, constituting a footing or ledge about eight or ten inches wide, on finding the vestibule door closed, if the evidence tends to prove that passengers were accustomed to use all the doors of the coaches as exits, that, on entering the car by the door next to the engine, he took the nearest seat to it, with intent to use it in alighting, that no rule regulating the method of leaving the train was promulgated, that the allowance of time for alighting was customarily insufficient to enable passengers to leave the train in an orderly and careful manner, that the door giving access to the vestibule from the car was open or unlocked and the vestibule arch unobstructed, that other passengers on previous occasions had safely left the train in the way in which he attempted to do so and that he would have succeeded, but for the starting of the train while he was so engaged, and before all other passengers had alighted; and the issue as to right of recovery for an injury sustained in such an attempt properly goes to the jury for determination. (p. 591).

(MILLER, JUDGE, dissenting.)

(LIVELY, JUDGE, absent.)

Error to Circuit Court, Kanawha County.

Action by Wirt W. Donally, administrator, of the estate of Joel H. Meadors, deceased, against John Barton Payne, Director General of Railroads of the United States, for damages for wrongful death of plaintiff's intestate. A verdict for plaintiff was set aside, and judgment rendered for the defendant, and the plaintiff brings error.

*Reversed; judgment for plaintiff on verdict.*

*A. A. Lilly* and *J. E. Brown,* for plaintiff in error.

*Leroy Allebach,* and *W. N. King,* for defendant in error.

POFFENBARGER, JUDGE:

Joel H. Meadors, in alighting from a train of the Kanawha and Michigan Railway Company, at Sattes· Station, on the night of October 25, 1918, as a passenger and in an unusual manner, fell between the first coach of the train and the tender, and was killed, after having been dragged or carried along for a distance of 40 to 80 feet.    In this action by his administrator against the Director General of Railroads, for recovery of damages for alleged wrongful death, the jury found a verdict in his favor for $10,000.00, which the trial court set aside, as being unsustained by the evidence, and then entered a judgment of *nil capiat*.    Of that judgment and the setting aside of the verdict, complaint is made on this writ of error.    The case went to the jury, upon admittedly correct instructions given at the request of the defendant, and without instructions on behalf of the plaintiff; and no rulings upon the admission and rejection of evidence are complained of.    The sole inquiry, therefore, is whether the verdict is contrary to the law and the evidence.

The train by which the fatal injury was inflicted carried officials and employees from Charleston, Dunbar, St. Albans and other places along the line of the road to the government munitions plant at Nitro.    There is no disclosure in the record of the number of trains employed in such service, but great crowds of people were transported to and from that point daily.    This train was known as No. 8 and evidently made several trips a day.    On this occasion, it consisted of four vestibuled coaches, left Nitro at 12:20 A. M. and carried 252 passengers, a sufficient number, according to the evidence, to fill all seats and practically all of the standing room. The cars were so badly crowded that progress through the aisles was slow and difficult.

The train carried no mail, baggage nor express cars.    The passenger coaches extended to the tender.  Meadors was in the first coach and had entered it at the front door thereof and taken the first seat at that end of the car.    When the train stopped at Sattes, a station two or three  miles from Nitro, he attempted to leave the car by the door  through which he had entered it.    Finding it closed and either not

knowing how to open it or being unwilling to lose the time re-
quired in the opening of it, he stepped from the vestibule
on the bumper of the tender, or ledge formed by the endsill of
the tender, about eight or ten inches wide, and endeavored to
follow it out to the side of the tender and alight from it.
While standing in this narrow space, with his left hand on the
top of the tender, he called for a light.   A friend on the
platform turned an electric flashlight on him, and apparently
he would have attained a safe position by another step, had
not the engine then started with a lurch which caused him
to fall.   As soon as he fell, he gave expression to his dis-
tress at the top of his voice and continued to do so, until he
had been carried or dragged to a public road crossing, dis-
tant about 75 feet from the point at which he fell.   There
it seems he was crushed by contact with the boards of which
the crossing was constructed.   At that point, blood was
found and beyond it parts of his clothing.   His mangled
body was found up the track about a quarter of a mile.

Although other passengers who had gotten off made frantic
efforts to attract the attention of the engineer and other train
men and get the train stopped, by yelling and signaling with
flash lights and otherwise, they were unable to do so, and all
of the train crew deny all knowledge of the tragedy until
they reached Charleston, and some of them say they knew
nothing about it until the next day.   The circumstances
strongly tend to prove he would have escaped death and ser-
ious injury, if the engineer had understood and heeded the
cries and signals; and some of the witnesses say the alarms
were of such character and so close that he must or should
have understood them.   They admit, however, that yelling
and cheering from passengers alighting at that point and rac-
ing to the ferry to get to their homes and lodgings at St.
Albans was usual and customary.   But, as insisted by the
witnesses and in the argument, the alarms on this occasion
were different from the noises and confusion ordinarily in-
cident to the detraining at that point.

Under our decisions, the failure, if any, of the train to stop
long enough to permit the decedent to leave it by the usual
exits did not justify the hazardous attempt he made to do

so by means of the space between the coach and the tender, unless peculiar circumstances take the case out of the general rule.    It amounts in law to contributory negligence barring recovery. *Hoylman* v. *Kanawha and Michigan Railway Company*, 65 W. Va. 264; *Booth* v. *Camden Int. Railway Co.*, 68 W. Va. 674; *Farley* v. *N. & W. Ry. Co.*, 67 W. Va. 350. This rule is predicated upon normal conditions.    It by no means precludes right of recovery in all cases of injury sustained in alighting from moving trains or choice of unusual means of exit.    It applies in the absence of circumstances compelling, inducing or sanctioning the act ordiarily held to be negligent.    The general principles of the law of negligence are not dependent upon particular facts or situations.    They are just as applicable to the relation of the parties in debarcation as in that of carriage.    A passenger may assume risks made necessary or induced by the conduct of the carrier.    Ordinarily, a passenger riding on the platform of a car is negligent and cannot recover, if injury proximately results from such act.    But he may recover in such case, if the crowded condition of the train rendered the act reasonably necessary. *Norvell* v. *Kanawha and Michigan Ry. Co.*, 67 W. Va. 467. There are many instances in which the overloading or overcrowding of cars, trains and other vehicles, has been held to be sufficient evidence of negligence on the part of the carrier, to carry the issue to the jury as to whether the passenger was excusable in the assumption of a position, or resort to conduct, that, under ordinary conditions, would have constituted negligence as matter of law, barring right of recovery.    4 R. C. L., secs. 635, 636.    The same doctrine applies to conduct on the part of a carrier, inducing a passenger to attempt to alight from the car in a dangerous place.    *Cartwright* v. *Chicago etc. R. Co.*, 52 Mich. 606.    In that case, the learned Judge Cooley said: "But we think a woman is excusable for not desiring to pass through the smoking car, and she has a right to assume it is not expected of her.    We also think that passengers, where not notified to the contrary, may rightfully assume that it is safe to alight from the car wherever it is stopped for passengers to leave it.    And if no light is given them to leave the car by, they are not to be

charged with fault for leaving in the darkness.'' See also *Diggs* v. *Louisville etc. R. Co.*, 156 Fed. 564; *Smith* v. *Ga. Pac. R. Co.*, 88 Ala. 538; *Memphis etc. R. Co.* v. *Stringfellow*, 44 Ark. 322; *Ouellette* v. *Grand Trunk R. Co.*, 106 Me. 153; *McGee* v. *Mo. Pac. R. Co.*, 92 Mo. 208. In case of reasonable necessity, a sick passenger may resort to the platform for fresh air, without incurring guilt of contributory negligence. *Morgan* v. *Lake Shore etc. R. Co.*, 138 Mich. 626. A passenger on a crowded excursion train may ride on a platform without such guilt. *Chesapeake & O. R. Co.*, v. *Lang*, 100 Ky. 221. Under such circumstances, a passenger is excusable in sitting on a car step. *Devine* v. *Chicago etc. R. Co.*, 177 Ill. App. 360. A negro passenger is excusable in standing on the car platform, if there is no room for him in the colored compartment, though there is room in the other to which he is not allowed access. 20 Tex. Civ. App. 587. The doctrine of justification by reasonable necessity, in taking a dangerous position on a train, extends to declination on the part of a male passenger, to crowd his way to a place of safety, to the exclusion of ladies, in case of lack of room. *Chicago etc. R. Co.* v *Fisher*, 141 Ill. 614. Whether a person was guilty of negligence in not going inside of a street car where there was unoccupied space is a question of fact for the jury, where the evidence shows there were about eighteen persons in the vestibule and on the steps, who obstructed passage into the car. *Peterson* v. *Elgin etc. Traction Co.*, 238 Ill. 403. For additional decisions illustrating the principle, see 10 C. J., 1145, 1146.

These decisions and numerous others of their classes seem to proceed upon about three different principles, namely: legal right in the citizen to have carriage, upon compliance with the conditions legally imposed upon him, by such means and facilities as the carrier has furnished, even though they may not be reasonably safe; legal right to observe and obey directions of the servants and agents of the carrier, or to act and rely upon inducements held out by them; and right to immunity from circumstances and conditions imposed or permitted by the carrier, which' influence or affect his judgment and discretion or deprive him of opportunity for free

and deliberate exercise thereof, in so far as he is required to rely upon them.    The first is analogous to the right of a citizen respecting the use of a highway.    Even though he knows it to be in an unsafe condition and that use of it is hazardous, he may nevertheless assume the risk, without prejudice to his right, provided he exercises care in the use thereof and it is necessary for him to make use of it. *Shriver* v. *County Court,* 66 W. Va. 685.    The other two have their foundation in the high degree of care and duty a common carrier owes to its passenger.    It is bound not only to furnish safe and suitable vehicles, machinery and appliances, but also to protect him from injury by others, as far as it is reasonably possible to do so and to abstain from all acts and conduct on its own part and that of its officers, agents and servants, that may occasion injury to him in any way.

There is an obvious difference, however, between the assumption, upon necessity or by inducement, of a known risk or hazard, and the incurrence of certain and inevitable injury.    For the latter, there is perhaps no justification, except in the case of sudden peril depriving the endangered person, whether a passenger, servant, traveller or other individual, of opportunity for deliberate judgment or prudent action. In the determination  of the question, whether to board a train or alight from it, by a person standing in a safe place and influenced by nothing more than fear of being left or carried past his station, that element probably cannot enter. Likely only danger of death or injury excuses an error of judgment.    Hence, a passenger probably cannot put himself in a situation that no reasonable or prudent person would take, in order to obtain passage on a train, or to prevent carriage beyond his station.    But, in such case, upon reasonable necessity or by inducement of the carrier, effected in any way, he may  assume such a risk of injury as an ordinarily prudent person would take, without incurring guilt of negligence; wherefore the issue as to negligence or contributory negligence in such cases is ordinarily one for jury determination.

Upon the inquiry as to the effect of the adoption of the unusual means of exit already described, by the decedent, it is

necessary to say, (1) whether, under all of the circumstances, the jury could find that his conduct was induced or caused, directly or indirectly, by the carrier; and, (2), whether the method adopted was such as the jury say an ordinarily prudent man would not consider too dangerous to resort to.

The facts and circumstances bearing upon the question of inducement are not very fully developed. Much of the evidence offered for disclosure thereof was rejected. As has been stated, the train was crowded. The stop was very short. The witnesses for the plaintiff say it was not longer than half of a minute or a minute, and circumstances related by them tend to prove a very short stop. According to the testimony of witnesses Howard and Zarnes, the stop was customarily short and allowed but little time for getting off. On this occasion, Speece stood on the first or lower step at the rear of the first car. Getting off and hurrying forward, he found Meadors endeavoring to get out through the front door. He says he "ran ahead." Howard, standing on the second step at the front end of the second car, when the train stopped, hurried forward, and reached the tender just as Meadors called for a light. He says he "traveled at pretty good speed." All passengers moved rapidly in effort to get out of the rain and to reach the ferry as quickly as possible. Generally, there was rivalry among them in reaching the ferry. According to Speece, Meadors did not stop to endeavor to open the door he found closed. He stepped right out of the vestibule on to the ledge at the end of the tender and called for light which Burlew furnished. Just as it was turned on him, the train started with a lurch and threw him off. That evidently occurred just about the time of the arrival of Howard who had rapidly walked a little more than 60 feet. Although it was no doubt possible for Meadors to have worked his way to the rear of the car he was in, during the run from Nitro to Sattes, he took a seat at the front of it and remained there until the train stopped, evidently intending from the first to leave the car through the door at that end. He and Speece had entered through the door by which he intended to leave the car. His conduct indicates reliance upon some sort of

assurance or his belief that that door would be available to him, and there is evidence tending to prove ground for such belief. Zarnes testified that it was customary for passengers to leave that train in such manner as they saw fit and to use all doors. His words are: "No certain way they could get out is the only way I could explain it. They came out of the vestibules." Speece said: "They most generally get off any place they can, and any way they can; off the front end of the engine, through the windows, or any other way, just to get off before the train starts, to keep from carrying them on through. I have got off that way many a time, down on the tender, before that time, myself." As to this, there is some contradiction in the evidence. The brakeman testified that the door next to the tender and the one at the rear of the train were never left open, that the passengers were never let out at the head and next to the engine, and that they were always worked through the rear. On the occasion in question, he assisted passengers to alight between the third and fourth cars. The conductor did not aid in the discharge of passengers. He thinks he was collecting tickets in the second coach. Passengers got off between the first and second, unattended. About 75 got off, only about 15 of whom were attended by the brakeman. There is conflict also as to whether the lattice gate was closed at the front end of the first car, the brakeman saying it was and other witnesses denying that it was. Contrary to the estimates of plaintiff's witnesses as to the length of the stop, the train register shows two minutes and the brakeman said he thought it was about two minutes. As the evidence is to be viewed as if it stood upon a demurrer thereto, that of the plaintiff, in the instances of conflict, is to be taken as true, in the absence of something conclusively establishing the contrary. *Coalmer* v. *Barrett,* 61 W. Va. 237; *Buck* v. *Newberry,* 55 W. Va. 681; *State* v. *Sullivan,* 55 W. Va. 597.

It is perfectly manifest that the jury could find, upon amply sufficient evidence, that the train was crowded; that the car door at the front end of the first car was unlocked, if not indeed open; that the lattice gate at that end of the car was not closed; that the vestibule door at that end of

the car had been used for exit as well as entry; that the decedent knew it had; that the circumstances induced belief on his part, that he could leave the car by that door; that he took the seat nearest to that door, intending to leave through it; that the train made very short stops in consequence of the rapidity with which the passengers debarked at that station; that the passengers were unduly hurried in alighting by reason of the shortness of the stops at that station; that finding the door closed and not knowing how to open it, or deeming the time too short to permit opening thereof, he had not time, under the existing conditions, to reach the other end of the car and alight there; and that he was taken by surprise occasioned by the circumstances here related, and influenced or induced by them to take the risk and hazard of exit through the space between the car and the tender.

Authorities herein referred to make it clear that to bring about or permit a situation of that kind is inconsistent with the extremely high duty imposed by the law upon carriers of passengers. A combination of circumstances arising from the manner in which such a carrier conducts its business and influencing or inducing a passenger to assume a risk of injury amounts to an obvious breach of duty to take care of him, while in the care of the carrier, abstain from harm to him, protect him from harm by others, provide for safety in his entry, occupation and exit. The carrier, as his custodian, is guilty of a breach of duty, in putting him in a situation which makes it necessary for him to choose between relinquishment of a right and incurrence of a risk of personal injury in the effort to retain it. To say the decedent, in the exercise of unusual caution, should have worked his way to the rear of the coach and thus insured his ability to get off safely, is not a sufficient response to this charge. To exact extreme caution and a high degree of care on the part of a passenger would necessarily involve a corresponding relaxation or abatement of care on the part of the carrier. The relation is reciprocal. Extreme duty rests upon the carrier. Hence, the passenger need not be wary. He may rightfully drop into the situation provided for him by his custodian. He may act and rely upon a plainly extended in-

vitation of the carrier, however effected or evidenced. He may yield to reasonable necessity occasioned by the situation made by the carrier, in his effort to obtain and enjoy his right of transportation, and, if in doing so, he takes a position which ordinarily would be regarded as dangerous, he is nevertheless faultless in the eye of the law.

In *Hoylman* v. *Kanawha and Michigan Ry. Co.*, cited, the conditions were normal. The train was not crowded. Ample time for exit was allowed. The passenger did not avail himself of the clear opportunity afforded him. The train was in motion before he reached the door. Nobody was in fault save himself. Before the train started, the conductor looked through the coaches and saw nobody moving toward the doors. It was upon these facts, that the Court held the passenger guilty of negligence as matter of law. That decision does not fit this case. It was a case involving purely normal conditions. Judge BRANNON observed that "There was no crowd". In the authorities he cited, exceptions to the rule are recognized. As stated in *Walters* v. *Chicago etc. Ry. Co.*, 89 N. W. 140, one of the cases he cited, the rule is stated thus: "An adult who knowingly and unnecessarily steps from a railroad train in motion is guilty of contributory negligence as matter of law." He interpreted Wood on Railroads as saying the question of negligence in such cases is not left to the jury, unless there are exceptional circumstances tending to excuse or justify the act. Here we have exceptional circumstances strikingly similar to, though not like, those held in many cases to have tended to excuse or justify conduct that would otherwise have constituted negligence *per se*. If, in the Hoylman Case, there had been circumstances tending to prove inducement, invitation or constraining influence, it would no doubt have been held to be a proper case for the jury. It is not intended here to hold that the decedent was not guilty of negligence. We merely hold that he was not guilty of it as matter of law and that it was for the jury to say whether he was or not, provided the risk he assumed was not so great that the court would be bound to say no ordinarily prudent man of the age and physical condition of the decedent would have incurred it.

This conclusion is not in conflict with any decision we have found. In *Wenzel* v. *City & Elm Grove R. Co.,* 64 W. Va. 310, there was no proof of the actual cause of the death of the plaintiff's intestate, and it did not clearly appear that the position he took in view of the crowded condition of the electric car on which he was riding, exposed him to any peril. Another passenger occupying a like position was not hurt. For all that any person can say from the evidence, he had voluntarily or negligently jumped, slid, or fallen from the car. In *Railroad Company* v. *Jones,* 95 U. S. 439, the decedent had unnecessarily taken a seat on the pilot of the engine, the boxcar provided for him and his coworkers affording plenty of room for him. Besides, he had been warned against riding on the pilot and forbidden to do so. In *Lowry* v. *Baltimore and Ohio R. Co.,* 74 W. Va. 791, there was not a circumstance tending in the lightest degree to justify the irregular action of the decedent, on the ground of necessity, invitation or constraint. He made no effort to get off on the side on which provision had been made for him. In getting off irregularly, he followed no precedent. In his case, there was no element of surprise induced in any way by the carrier. Besides, he walked into the very jaws of apparent death. He took a risk no prudent man would have taken. Here, the thing attempted was feasible and would have been safely accomplished, but for the starting of the train a second or two earlier than the decedent supposed it would start.

Though an aged man, he was physically strong and active. According to the testimony of Speece and Howard, he would easily have succeeded in his effort, but for the starting of the train. From their evidence, it is also clear that he acted quickly and energetically. Another second or two of time would have put him beyond danger. The jury could have found that the stop was too short to allow other passengers to get off and, therefore, shorter than the usual short stop. Speece testified that people were still getting off as cars passed him. On this question, the length of the particular stop, as compared with that of previous stops, may be considered and is forceful. Meadors could rely upon his knowledge of the usual practice. The evidence bearing upon the character

of the risk obviously makes it also a question for the jury.

As the verdict is sustained upon this theory, it is clearly unnecessary to enter upon any inquiry as to the sufficiency of other grounds of liability insisted upon.

If the verdict had been properly set aside, there should not have been a judgment of *nil capiat.*

For the reasons stated, the judgment will be reversed, the verdict reinstated and a judgment rendered thereon.

*Reversed: Judgment for plaintiff on verdict.*

MILLER, JUDGE, *(dissenting)*:

I must decline to concur in the opinion of the court in this case. I do not see how there can be two opinions about the question of fact that decedent was guilty of the grossest negligence and disregard for his own safety, in attempting to alight from the end of the coach where the vestibule doors were closed against him, and by undertaking to leave by the end sill of the tender, a method so manifestly dangerous and unusual as to warn any reasonable man of the great danger in doing so. When he entered, he took a seat near the door, and when the train stopped it took him but a second to discover that that door was closed, which was notice to him not to attempt to leave by that way. No other passenger undertook to do so. Every other passenger destined for Sattes moved in the direction of the rear door of the coach. A passenger who had gone out by the rear door and walked the entire length of the coach saw decedent in the act of trying to open the front door. How long he continued in this before taking his position on the end sill of the tender does not appear. Although the evidence tended to show a car more or less crowded, all got safely to the platform uninjured, except decedent.

The main act of negligence alleged and relied on, was the alleged failure of defendant to stop its train long enough for passengers to alight at Sattes. No trainman saw the decedent in his place of danger. Enough time elapsed for him to get out there in the dark, with no light to guide him, for one witness says he called to him to use a flash light upon him to enable him to see. Assuming that defendant was

negligent· in not making a longer stop, that fact did not justi-
fy the decedent in attempting to leave the coach by a way
he knew had been closed against him.   It was unnecessary
for him to take this desperate chance.   The fact that some
passengers may have been seen jumping off the rear end of
the coach when it passed the place where the front end had
stood, argues little.   It is most improbable, and no witness
swears that the signal to go was given the engineer while
passengers were still in the act of alighting from the train
at the place where they were invited to alight.   If any alight-
ed afterwards, they had loitered or been slow in leaving the
train.   In *Simmons* v. *Seaboard Air-Line Railway*, 120 Ga.
225, it was decided, opinion by Lamar, Judge, afterwards an
associate justice of the Supreme Court of the United States,
that if a person voluntarily assumes a risk, accompanied by
some supposed negligence of the carrier, such conduct on his
part is not merely contributory negligence, lessening the
amount of damages, but a failure to avoid danger, defeating
his right to recover anything.   In this case Justice Lamar
held that, if one has a "clear chance" to avoid a danger,
which the evidence in this case shows decedent appreciated,
and chooses not to do so, but to risk it, his negligence, not
that of defendant, becomes the proximate cause of his in-
juries, and will defeat any recovery.   The doctrine of the
Georgia case is settled law everywhere.   See 2 Shearman &
Redfield on Negligence, (6th ed.), §519 et seq., and illustra-
tive cases cited.

The liability of a carrier is always conditioned upon the
exercise by the passenger of reasonable and proper care and
caution for his own safety.   *Baltimore and Potomac Railroad
Company* v. *Jones,* 95 U. S. 439.   Does it need argument to
show that Meador was lacking in this particular, when he
chose the most dangerous method of alighting from the coach?
One or two of the counts in the declaration undertook to ex-
cuse his negligence by averring that he was old and deaf and
that his eye sight was bad; but on the trial this theory was
abandoned, and as some justification for his foolhardy act,
evidence was introduced as tending to show that though he
had passed beyond the time ordinarily allotted to man to live,

Meador was possessed of all his facilities, was agile and act-
ive, and therefore was justified in taking the hazardous
choice of going out of the car over the end sill of the tender.
In the case of *Railroad Co.* v. *Jones, supra,* it is held that
a passenger will not be justified in taking such a risk, even
though he may be invited by the trainman to do so; that in
such case his injury must be ascribed to his own recklessness
and folly.  I see little room for distinguishing this case from
*Hoylman* v. *K. & M. Ry. Co.,* 65 W. Va. 264.  The mere
scintilla of evidence that the railroad company had suffered
passengers to leave the train by unusual avenues, as windows,
furnished no excuse for passengers to risk their lives in doing
so when wholly unwarranted, so as to carry the case to the
jury on the question of contributory negligence.  *Dye* v. *Cor-
bin,* 59 W. Va. 266; *Ketterman* v. *Dry Fork R. R. Co.,* 48 W.
Va. 606, 614-615.  In *Wenzel, Admr.* v. *City & Elm Grove R.
R. Co.,* 64 W. Va. 310, we affirmed the judgment below ex-
cluding plaintiff's evidence and directing a verdict, where
a passenger was seated on the floor of an electric car with
his feet on the running board, and was thrown off the car
when running at a rapid rate when turning a curve, such
running of the car not of itself showing negligence justify-
ing a verdict against the railroad company.  In *Lowry* v.
*Balto. & Ohio R. R. Co.,* 74 W. Va. 791, we affirmed the judg-
ment below sustaining defendant's demurrer to plaintiff's
evidence, where plaintiff undertook in the daytime to alight
from the end of the coach where no platform was provided,
instead of the place where the other passengers were invited
to alight; this upon the principle that it is the duty of a
passenger to use his senses and use the way provided for
alighting, and not to attempt to alight by ways obviously
dangerous.  In that case we cited with approval *Norfolk &
Western Railway Co.* v. *Hawkes,* 102 Va. 452, holding that
the law imposes no such obligation on railways to one injured
by his own negligence, against which common prudence would
have protected him, and that it was immaterial that he
thought he was in a place of safety.

I do not find it convenient to elaborate an opinion on the
subject, and besides, a dissenting opinion is generally a work

of supererogation and quite uninteresting; but this much I feel constrained to say in protest against the decision. I think the judgment below was clearly right and ought to be affirmed.